## A98A2158. GENERAL MOTORS CORPORATION v. BLAKE.
(515 SE2d 166)

BEASLEY, Presiding Judge.

Felicia Blake was permanently crippled in an automobile collision on November 4, 1992, when the driver of a taxicab lost control of the cab, crossed over into the oncoming lane of traffic, and crashed head-on into the 1988 Chevrolet Spectrum automobile driven by Blake. Blake sued the driver, the taxicab company, and General Motors Corporation, the maker of the Spectrum, claiming that crippling leg injuries she suffered in the accident were caused by a defective seat belt in the Spectrum which failed to restrain her. The other defendants were not involved in the trial, in which a jury returned a verdict in favor of Blake in the amount of $3,800,000.

1. In its first enumeration of error, General Motors (GM) claims the court erred by denying a continuance sought again by GM on the day of trial, on the basis that it was surprised and prejudiced by

Blake's identification of an expert witness the week before, which witness Blake used allegedly to present a new theory of the case.

A motion for continuance of a trial is properly addressed to the "sound legal discretion" of a trial judge, who is in control of the management of the case in court. OCGA § 9-10-167; *Work Clothes Outlet v. M & S Purchasing*, 188 Ga. App. 179, 181 (2) (372 SE2d 509) (1988). The appellate court, which is far removed from the unfolding development in the life of a case in court and does not participate in its ongoing journey, is therefore bound to respect the exercise of the trial court's discretion and reverse it only if it is "manifestly abused." *Simmons v. Simmons*, 265 Ga. 183, 184 (453 SE2d 696) (1995).

This Court, like the Supreme Court as discussed in *Mills v. State*, 188 Ga. 616, 623-625 (4 SE2d 453) (1939), is a court for the correction of errors of law made by the trial courts.[1] *Oasis Goodtime Emporium I v. Cambridge Capital Group*, 234 Ga. App. 641, 642 (1) (507 SE2d 823) (1998). As was said of the Supreme Court in *Mills*,

> [w]e can not undertake to correct errors of fact. We are prohibited from so doing, and can only decide law questions. But no such limitation is placed on the judges of the superior [or, in this case, state] court. . . . Ours is the function merely to see that the law is followed. Theirs is the solemn responsibility to see to it that justice is administered according to the evidence as well as the law. . . . A judge of the superior [or state] court has authority which [the Supreme Court and likewise this Court] [do] not possess.

188 Ga. at 623-624. The great power entrusted to the trial judge is a judicial discretion, justified by skill and by functional commitment to the singular purpose to serve "the great object for which courts are established — to administer justice according to law." Id. at 624.

The judicial conscience is applied when a trial judge is called upon to exercise discretion. To say that as a matter of law that discretion was abused is a matter of no small moment. As related to denial of a trial continuance, not only does a legal conclusion of abuse derail the case from its journey to finality and require costly and lengthy and wearing retrial, but with hindsight it second-guesses a trial court in managing the case.

The denial of a continuance in this case did not exceed the broad bounds of discretion. We cannot say that it was outside the law's contemplation to require General Motors Corporation to proceed.

The complaint was filed in October 1994, and the first motion for

---

[1] The Georgia Constitution does not expressly so state but does describe the nature and function of this Court as being "a court of review." Ga. Const. of 1983, Art. VI, Sec. V, Par. III.

continuance sought a delay beyond Monday, April 28, 1997. The motion had been filed on Thursday, April 17. It gave as reason that GM did not yet know the identity of plaintiff's experts on the subject of seat belt manufacture, design, and performance and thus could not depose them to discover their opinions on those subjects as well as vehicle speed, force of impact, occupant kinematics and injury causation. The motion was argued in chambers, without being reported, on Tuesday, April 22 (defendant's recollection) or Thursday, April 24 (the court's recollection). At that time it was denied.

Defendant renewed the motion in a five-sentence argument on Monday, trial day, based on a vague reference to deposition testimony given on Friday. Plaintiff responded, defendant briefly replied, and the court, unpersuaded by the recitation, again denied the motion. Defendant had filed a number of other motions in the interim between filing the motion for continuance and the commencement of trial, and a pretrial order had been entered. The consolidated pretrial order entered April 23 states: "Since the case will take longer than one week to try, General Motors requests that it be specially set or held in place until it becomes the first case on a trial calendar."

The renewal of the motion was based on the fact that on the previous Friday, GM "deposed for the first time [plaintiff's] liability expert, and that's the expert who is testifying as to what they believe was the defect in this automobile, and who is an expert who had been identified a week or so earlier." Defendant stated that at the deposition it "learned for the first time" the theory of defect which plaintiff would travel on, which it had not known previously and that there were other experts still to be deposed. GM did not explain how the theory differed or how it would be prejudiced. It simply stated that severe prejudice to defendant would result unless there was time for additional discovery.

Plaintiff responded by pointing out that there was no change in the allegation of negligence that had been advanced all along, i.e., that the seat belt did not hold her or her passenger upon impact. She did not know exactly why it did not hold and thought at first it was attributable to a design or manufacturing defect in the buckle. But that had been fairly conclusively eliminated by the experts during arbitration as the locus of the failure. Plaintiff pointed out that a number of experts on both sides of the case had examined the apparatus and that although there was a change in the theory pinpointing exactly what failed, the substance of the allegation remained the same. She assured the court that although one expert on each side still had to be deposed, that could be done without again delaying the trial. Plaintiff expressed the fear that, because of what had been said at the chambers hearing, defendant would further elongate and

expand the whole proceeding by pursuing a motion for summary judgment and was using the motion for continuance to achieve that purpose. Defendant replied briefly that its try for summary judgment was based on a lack of expert evidence of defect, and that additional discovery was necessary to prevent prejudice to GM.

The court took all of this into account, including the fact the case had been set for trial once before but had come off the calendar with the consent of all parties, and it denied the renewal motion.

The court cannot be faulted. First, GM's argument for continuance did not elucidate the "surprise" of the new theory allegedly discovered the preceding Friday. The key to its request to stop the process was shrouded in the single sentence that it had learned that "the theory of defect had changed from the pleadings and responses to discovery . . . previously . . . served and filed." Without giving the court more detail of the magnitude or nature of this change, GM could have had little expectation that the court would consent. The superficial argument, unsupported by brief or written motion, did not compel a decision to comply with the request. The trial court can hardly be expected to fathom the depth of what defendant contended it was faced with, absent more than the sparse explanation offered.[2] As for the discovery, plaintiff showed that what remained to be done could be accomplished without interrupting the trial schedule. Defendant did not disagree.

Second, the evidence accepted by the jury clearly shows that the seat belt failed to perform its function as anticipated, which led to the shattered leg, confinement to a wheelchair, and permanent disability of plaintiff. True, she was uncertain during trial preparation and at times inconsistent as to *how* the seat belt failed, but she steadfastly maintained that it did not restrain her as it was designed to do, given that she had the belt on and fastened at impact. Throughout the course of the trial discovery and preparation she kept trying to pin down exactly what part of the mechanism went wrong. She thought for a long time that the buckle did not hold but rather unlatched. Then she realized that was not the problem. She kept searching and, before trial, determined that the problem was unstopped spooling which resulted in an overloaded cinch and consequent failure to hold her back. That theory was actively investigated by both sides on the Friday before the Monday trial was to begin.

*Firestone Tire &c. Co. v. King*, 145 Ga. App. 840 (244 SE2d 905) (1978), involves similar facts. The tire at issue clearly failed, resulting in a blowout and injuries to plaintiff. The plaintiff's experts

---

[2] The expansion of this on appeal, given defendant's hindsight and reflection, is not relevant to the basis upon which the trial court was called to rule.

"could not specify the exact nature of the defect which, in their opinion, caused the tire to fail. Instead they merely speculated as to possibilities, such as contamination of materials or undervulcanization." Id. at 842 (1). This Court ruled in favor of plaintiff, holding:

> We do not agree that it was necessary for the [plaintiff] to specify the nature of the defect in order to meet her burden of proof. It has often been held that the existence of a manufacturing defect in a products liability case may be inferred from circumstantial evidence. [Cits.]

Id. *King* indicates that precise specificity is not essential for recovery so long as plaintiff can show that the seat belt did not operate as intended and this was the proximate cause of her injuries. That being so, the absence of precise specificity when unknown gives no cause for trial delay. In the present case, GM did know the specifics several days before trial but, more importantly, could have tested the entire seat belt apparatus for months, if not more than a year, before.

That leads to the third reason. GM had every opportunity to completely examine the belt, its retractor and its cinch latch plate as well as its buckle, particularly after it eliminated the buckle as the problem by the time of the arbitration hearing in August 1996. Its expert for the arbitration, a former GM testing engineer, examined Blake's seat belt system and found no deformation of the buckle or defect so that it would inertially unlatch. He did find marks on the guide loop assembly and the seat belt webbing and deformation of the guide loop assembly bushing at the attaching bolt hold. He also found that the body anchorages for the belt system bolts for the driver's seat belt system were deformed. He attributed all of this to the collision impact.

Fully aware that the issue was why did the seat belt not restrain plaintiff, if it did not do so,[3] GM apparently tactically decided not to conduct a fuller and more complete investigation of the apparatus. Defendant should not be permitted to avoid learning the facts by lack of thoroughness and then claim surprise. Its experts were as equipped as plaintiff's, if not more so, to discover the cause. It had the capacity and resources to do all kinds of examinations and tests on the seat belt mechanisms. It apparently did not explore the possibility that the source was the retractor.

Cases concerning surprise are not on point because in this

---

[3] There was ample evidence early on that the plaintiff and her three-year-old goddaughter, who was killed, were wearing seat belts. Even defendant's expert so concluded. Yet defendant claimed surprise and says it "was prepared to defend against a case that assumed plaintiff was not buckled, not a case that assumed she was."

instance the surprise was of GM's own making. See, e.g., *Jones v. Atkins*, 120 Ga. App. 487, 491 (1) (171 SE2d 367) (1969). The rules of procedure are concerned with prevention of surprise, to be sure, but the surprise must be genuine and justified. *Kamensky v. Stacey*, 134 Ga. App. 530, 532 (1) (215 SE2d 294) (1975) states:

> [W]here the complaining party cannot legitimately claim surprise, either because he knew of the existence of the [facts to be testified to] or had equal means of knowing, it is not error to fail to invoke the sanctions of postponement, mistrial, barring the witness, etc. [Cits.]

*Danforth v. Danforth*, 156 Ga. App. 236 (274 SE2d 628) (1980), a case dealing with a reasonable time for discovery under OCGA § 9-11-40 (a), is inapposite. "[D]efendant had had only 29 working days of discovery and 18 of those had already passed when he was informed that he would have only 11 more, and only 5 more after plaintiff was to answer the defendant's first interrogatories." Id. at 238. What is on point is that the Court went on to say: "If the defendant . . . had already had a reasonable and adequate time for discovery . . ., then the defendant might [not be entitled to a continuance]." Id.

The judgment, based on a jury verdict for plaintiff after a trial which consumed the better part of nine days, should not be reversed nor should a new trial be required.

2. We have carefully reviewed the other enumerations of error and find them each to be without merit.

*Judgment affirmed. McMurray, P. J., Pope, P. J., Blackburn, Ruffin and Eldridge, JJ., concur. Andrews, J., dissents.*

ANDREWS, Judge, dissenting.

Because the record shows that General Motors (GM) was unfairly surprised by Blake on the eve of this complex product liability trial with an entirely new theory of recovery, the trial court abused its discretion by denying GM's motion for a continuance. The majority concludes that the surprise was of GM's own making. This conclusion ignores that Blake initially stated in her complaint and subsequently relied upon one claim of product defect from October 31, 1994, until she revealed to GM an entirely new and unrelated claim of product defect on the afternoon of April 25, 1997, just two days before the start of the trial. It also ignores that, during this entire period of time leading up to the eve of the trial, Blake failed to reveal the new defect claim and failed to reveal the expert witness she used at trial to explain the new claim, despite the fact that GM had specifically sought this information in formal discovery. Nevertheless, the majority blames GM and concludes that GM should have

obtained the product (which was in Blake's possession), dismantled it, and attempted to discover whether it might have a defect Blake had not claimed which Blake might rely upon at trial. In other words, the majority concludes that GM should have divined Blake's real defect claim while Blake withheld responses to GM's discovery and actively misled GM with claims of an entirely different product defect. In concluding that the trial court properly exercised its discretion to deny GM a continuance under these circumstances, this Court sanctions the very type of trial by ambush that the discovery rules and the proper exercise of judicial supervision were designed to prevent.

Blake's complaint against GM was filed on October 31, 1994, and alleged that the seat belt she was wearing at the time of the accident was defective in that it unexpectedly opened or unlatched during the accident and therefore failed to restrain her. Blake stated in a post-trial brief that she "initially contended that her seat belt unlatched during the collision as a result of a defective condition known as 'inertial release.' " GM served interrogatories on Blake on January 18, 1995, in which Blake was asked to state which part or parts of the automobile she contended were defectively designed or manufactured, state the contended defect in any such part, and identify each expert she expected to call as a witness at trial in support of these contentions along with the substance of the facts, opinions and grounds for the opinions of each such expert. Blake responded to the interrogatories on March 1, 1995, stating that the defectively designed or manufactured part was her seat belt. In stating the contended defect in the seat belt, Blake responded that, "The seat belt did not hold Plaintiff . . . on impact. Plaintiff believes there was a defect in the design and/or manufacture. Plaintiff lacks sufficient knowledge or expertise to respond further to this Interrogatory." In responding to GM's interrogatory seeking information as to expert testimony, Blake stated that, "Plaintiff has not yet identified an expert. Plaintiff will supplement this response."

The record shows that the case was subsequently ordered to arbitration in January 1996. At the arbitration hearing in August 1996, Blake contended that she was thrown forward into the dashboard and steering wheel during the accident because the seat belt she was wearing opened or unlatched. However, during arbitration GM produced expert testimony that Blake's seat belt restrained her during the accident and did not inertially unlatch. Because of the expert testimony produced by GM at the arbitration hearing, Blake thereafter started to look for another theory, other than unlatching, to support her claim that the seat belt was defective. As Blake stated in response to a post-trial motion filed by GM:

At the arbitration hearing in this case, GM effectively demonstrated that Plaintiff's seatbelt probably did not unlatch by inertial release. Although Plaintiff still had substantial evidence that the seatbelt system malfunctioned during the collision, Plaintiff could not determine the specific defect which caused the failure without retaining an expert to conduct a detailed physical examination of the seatbelt and its mechanisms.

Unsatisfied with the results of arbitration, Blake filed a demand for a jury trial on August 9, 1996. Thereafter, the case was set by the Fulton County State Court for trial to begin on March 17, 1997, but the trial court granted a joint motion to remove the case from the March calendar because of conflicts with other scheduled cases. The case was reset for trial to begin on April 28, 1997. After the case was reset for trial, GM filed a motion for a continuance on April 17, 1997. The basis for the motion was that GM needed additional time to conduct discovery of Blake's expert witnesses and to identify and prepare rebuttal expert witnesses. In support of the motion, GM pointed out that, over two years earlier, it filed interrogatories seeking the identity of Blake's expert witnesses, but that Blake did not identify any experts in her response to the interrogatories nor had she supplemented her responses as required under OCGA § 9-11-26 (e). GM further noted that, after the case was removed from the March 1997 calendar, it wrote Blake on March 14, 1997, stating that discovery of expert witnesses needed to be completed. Blake responded to that letter on March 18 stating that, "We are in the process of obtaining dates from our experts and will be in touch with you later." GM further showed that, after the case was reset for trial on April 28, counsel for GM contacted Blake's counsel by telephone on April 14 at which time Blake's counsel gave GM the names of two experts Blake intended to call at trial, stated that a third expert would be identified later, but gave no information as to the subject matter of the experts' testimony.

On April 18, 1997, without the benefit of any discovery from Blake's experts, GM supplemented its responses to Blake's interrogatories identifying experts it intended to call as witnesses to rebut Blake's standing claim that the seat belt was defective and failed to restrain her because it unlatched during the accident. On April 21, 1997, Blake supplemented her responses to GM's interrogatories as to expert witnesses. Blake identified three experts, two engineers and a medical doctor. As to the engineers, Blake's supplemental response stated that one engineer would offer testimony "as to the seatbelt system" and the other would testify as an accident recon-

structionist about "the collision, the seatbelt, and the damage to the vehicle."

On April 22, 1997, the trial court heard and denied GM's motion for continuance. On April 23, 1997, the trial court entered a pretrial order in the case which stated in part that: "Discovery of expert witnesses is not complete. The parties are working to schedule the depositions of expert witnesses." The portion of the pretrial order setting forth Blake's contentions with respect to the seat belt stated only that, "Plaintiff asserts that the seat belt restraint system was defective, negligently designed, tested, manufactured or sold."

On April 25, 1997, the Friday before the trial was scheduled to begin on Monday, April 28, Blake for the first time had Dr. Townsend, one of her expert engineers, examine the Spectrum's seat belt system which she claimed was defective. As a result of his examination of the seat belt, Dr. Townsend concluded that the seat belt was defective and failed to properly restrain Blake during the accident. However, Townsend's theory as to why the seat belt was defective was unrelated to Blake's earlier claim that the seat belt was defective because it unlatched during the accident. Townsend's opinion was that, while the seat belt remained latched, there were simultaneous failures in two other components of the seat belt system, the retractor (which spools out belt to allow the occupant to put on the seat belt but locks to prevent spooling on impact) and the cinching latch plate (designed to cinch down to prevent lap belt slippage). Townsend concluded that a manufacturing defect in the retractor prevented it from locking, allowing a length of belt to improperly spool out from the retractor on impact. He then concluded that the cinching latch plate also failed by allowing the improperly spooled-out length of belt to pass through and loosen the lap belt. Townsend concluded that the loosening of the lap belt caused by the failure of these two components allowed Blake to slide forward in the seat belt system seven inches more than she would have had the system properly restrained her during the accident. According to Townsend, the extra seven inches Blake slid forward allowed her right leg to make contact with either the dashboard or the steering column in a manner that caused severe leg injuries she would not have suffered had the seat belt system functioned properly.

Central to Townsend's opinion was his conclusion that the retractor failed because of a manufacturing defect. When Townsend first examined the retractor, he stated that it worked properly. He then disassembled the retractor, which required the removal of six plastic pins holding the cover in place. During the disassembly, Townsend said that he lost one of the pins when it went "ping" and flew off the table into a nearby radiator. He then put three of the remaining five pins back into one side of the retractor, leaving two

pins on the table. However, later in the examination, Townsend said he suddenly realized there were three pins on the table instead of two. He concluded that the third pin which appeared on the table must have been an extra pin placed loose inside the retractor during a defective manufacturing process and that it fell out of the retractor onto the table during the disassembly. He further concluded that the extra pin inside the retractor prevented the retractor from locking properly in the accident. He explained that the retractor worked properly before he disassembled it only because the loose pin inside the retractor was not in the critical location at that time to prevent locking.

Townsend formed these opinions, which became the new basis for Blake's claim, after Blake made the seat belt system available for his examination on April 25. Accordingly, GM's first opportunity to learn that Blake had abandoned her initial unlatching defect claim and adopted a new unrelated defect claim was when it deposed Townsend on the afternoon of Friday, April 25, just two weekend days prior to the trial set for Monday, April 28. On April 28, prior to the commencement of the trial, GM informed the trial court that, after deposing Blake's expert, Townsend, on Friday afternoon, it was surprised to learn that Blake was proceeding on an entirely different defect claim from the claim she had initially set forth and pursued during the litigation. GM informed the trial court that, in light of this surprise, it would be prejudiced in its defense of the case without a continuance. Accordingly, GM renewed its earlier motion for a continuance made on the basis that GM needed additional time to conduct discovery of Blake's expert witnesses and to identify and prepare rebuttal expert witnesses. The trial court responded that the case had been pending since 1994, had been continued from the March calendar, and that any unfairness caused by the surprise was not created by the court. Finding "no evidence saying that all of this could not have been done previously," the trial court again denied the motion for a continuance.

When the trial commenced, Blake relied on Dr. Townsend's expert opinion testimony to establish her claim that the seat belt was defective and caused her severe leg injuries. In the absence of a continuance to allow GM to obtain additional evidence or witnesses to consider and respond to Dr. Townsend's new defect theory, GM attempted to rebut Dr. Townsend's opinion testimony with the expert opinion testimony of David Peruski. Peruski had previously been identified by GM during arbitration and in GM's April 18, 1997 supplemental responses to Blake's interrogatories as the expert GM intended to rely upon to rebut Blake's original claim that the seat belt was defective because it unlatched during the accident. After being qualified at trial to give expert opinion testimony as to seat

belt design and performance, occupant kinematics, and accident reconstruction, Peruski gave his opinion rebutting each aspect of Dr. Townsend's opinion, except the critical portion of Dr. Townsend's opinion that the retractor was defective and failed to lock on impact because of a manufacturing defect which placed a loose pin inside the retractor. When GM attempted to offer Peruski's expert opinion that it would have been impossible for a loose pin to be placed inside the retractor during the manufacturing process, the trial court sustained Blake's objection that Peruski was not qualified to give expert testimony as to the manufacturing process involved in the placement of the pins into the retractor.

In support of his opinion, Dr. Townsend also testified as to the results of an exemplar study of the accident which he conducted on Saturday, April 26, 1997, the day after he was deposed by GM and less than 48 hours prior to commencement of the trial. Dr. Townsend illustrated the study to the jury by the admission of photographs of Blake placed in a similar Spectrum automobile. In an attempt to rebut Dr. Townsend's exemplar study, GM had Peruski conduct a similar exemplar study using another Spectrum and a human model matching Blake's physical description. GM did not complete this study and develop the photographs to illustrate it until Wednesday, April 30 or Thursday, May 1, during the first week of the trial. Although Peruski was allowed to testify as to the results of his study when GM began the presentation of its defense on Friday, May 2, the trial court refused to admit photographs of the study. The trial court sustained Blake's objection that admission of the photographs would be unfair because Blake's counsel did not receive them until the afternoon of Thursday, May 1 and had not had an opportunity to have them examined by their experts, who had already left town. Direct and cross-examination of Peruski continued through Friday. When the second week of the trial commenced on Monday, May 5, GM again offered the photographs for admission noting that Blake had the entire weekend to have them examined. The trial court first admitted the photographs then reconsidered and excluded them on the basis that they were not timely produced.

The record in this case shows that, after filing this defective seat belt claim in October 1994, Blake maintained her initial theory of the defect until an expert witness she did not formally identify until a week before the April 1997 trial formed an opinion just two days prior to the trial that other unrelated defects in the seat belt caused her injuries. GM immediately deposed Blake's expert after he examined the seat belt and formed his opinion and discovered just two weekend days before the trial was scheduled to begin that Blake's claim was based on an entirely new defect theory. Although GM mounted a credible defense to the new claim on short notice, the

record shows that GM's defense was prejudiced by its inability, without more time, to adequately prepare for and rebut expert testimony presented by Blake which was critical to her claim. Under the facts of this case, I agree with GM's contention that this constituted surprise which entitled it to a continuance of the trial.

Where a witness providing testimony of a potentially critical nature, which opposing counsel does not know about or have equal means of knowing, becomes known shortly before trial, opposing counsel is entitled to a reasonable amount of time prior to trial to depose the witness, check the facts to which the witness would testify and, if indicated, arrange to secure rebuttal or impeachment evidence. *Jones v. Atkins*, 120 Ga. App. 487, 490-491 (171 SE2d 367) (1969); *Kamensky v. Stacey*, 134 Ga. App. 530, 532 (215 SE2d 294) (1975); *Hanna Creative Enterprises v. Alterman Foods*, 156 Ga. App. 376, 378-379 (274 SE2d 761) (1980). A refusal to postpone a trial under these circumstances would subject the party against whom the witness testifies to prejudicial surprise and would constitute an abuse of discretion requiring the grant of a new trial. *Jones*, 120 Ga. App. at 491; *Hanna*, 156 Ga. App. at 379.

GM has demonstrated that Dr. Townsend was a critical expert witness whose opinion testimony it did not know about or have means to know about until two days before the trial. Although GM was able to depose Dr. Townsend prior to the trial, under the circumstances of this complex products liability case, two days was not a reasonable amount of time prior to trial to check the facts and opinions to which the witness intended to testify and arrange to secure rebuttal or impeachment evidence. The record shows prejudice suffered by GM as a result of inadequate time to prepare a rebuttal to Dr. Townsend's testimony. It was not necessary for GM to show what further discovery or other efforts it might have made with the additional time it sought by continuance of the case, or what these efforts might have revealed, since GM likely did not know. *Danforth v. Danforth*, 156 Ga. App. 236, 238 (274 SE2d 628) (1980). Because the trial court abused its discretion in denying the motion for a continuance, GM is entitled to a new trial.

DECIDED MARCH 19, 1999 —
RECONSIDERATION DENIED APRIL 1, 1999 —

*King & Spalding, Lanny B. Bridgers, William R. Bassett, Jr., Carolyn E. Wright*, for appellant.

*Sharon E. Howard, James W. Howard, Christopher J. McFadden*, for appellee.